First from counsel for Mr. Suhl. Good morning. Thank you, Judge Colleton. Canon Shanmugam of Williams and Connolly for the appellant Theodore Suhl. May it please the court. This case presents important questions concerning how public corruption cases should be charged and tried in the wake of the Supreme Court's decision in McDonald. It was clear after McDonald that the conduct charged in the indictment in this case was not a crime because the alleged quid pro quo agreement did not involve any valid official acts. Rather than seeking a superseding indictment, however, the government simply pursued a different theory at trial, alleging only that appellant made payments with an intent to influence a public official. That constructive amendment of the indictment was invalid, but the district court compounded its error in allowing this case to proceed when it dispensed with the requirement of a quid pro quo from the jury's instructions. And it gutted appellant's defense by preventing him from presenting evidence concerning his intent in making the donations at issue, and also evidence concerning the motivation of the government's star witness. What about the second, before we get too deep, has the Second Circuit effectively decided the case? I know it doesn't bind us, but have they effectively decided the issue in this case, that's the Boylan case? No, I don't think so. And this is on the, obviously there are lots of issues in the case, Judge Benton. This is on the issue of whether Section 666, the federal funds bribery statute, requires official acts. And it is certainly true, as we acknowledge in the exchange of letters, that there's language in the Boylan opinion that seems to suggest that official acts are not required. Now, we respectfully submit that that is incorrect. We rely on language in this court's opinions, and particularly in the Zimmerman and Griffin opinions, that seems to suggest that this court takes the view that official acts are required in Section 666, as they are in all of the other public corruption statutes. Indeed, the government has taken that position, as we indicated, when it sought jury instructions in the Skelos case. And I would respectfully submit that the best exposition on this issue is the Jennings case from the Fourth Circuit, which talks about this issue in great detail, which sets out the history of the enactment of Section 666. And I would just note, to make the affirmative argument for a sentence or two, that the reason why we think that official acts should be required is, first, because it would be anomalous for Section 666, unlike all of the other public corruption statutes, to omit such a requirement in light of the concerns expressed by the Supreme Court in Skilling about chilling otherwise permissible conduct. And second, because if you look at the history of the enactment of Section 666, I don't think that Congress, in not using the words official act, intended to omit that requirement where what you're talking about is bribery of public officials. Section 666 is somewhat broader, because it extends to payments not only to public officials, but also to certain private officials, as this court's decision in Redzic indicates. And so I think for that reason, Congress did not specify an official acts requirement. But we think that that is, in fact, a requirement. And this goes to two of our substantive arguments. What would be the textual basis for such a requirement? Well, Judge Colleton, I think, first of all, there is the argument, as there was with the honest services statute in Skilling, that notwithstanding the fact that the honest services statute does not have an official acts requirement, there are concerns about the vagueness of a statute that does not contain such a requirement in light of the underlying concern about shilling permissible activity vis-a-vis government officials. And second, You think it would be unconstitutionally vague if such a requirement were not read into 666? I think so, but I also think that Section 666 intends to capture traditional bribery and potentially traditional gratuities as well, though that's an open question. And as the Fourth Circuit lays out in great detail in the Jennings case, if you look at the traditional requirement of bribery, it is that you have a quid pro quo, that you have the offering of money in return for an official act. And again, I think that to the extent that there's not a statutory reference to official acts, Judge Colleton, it's because the statute, in the words of the statute, refers to offering to give something of value to any person with an intent to influence or reward an agent of an organization or of a state, local, or Indian tribal, or tribal government, or any agency thereof. And so therefore, the official acts requirement obviously only would apply to those individuals who are, in fact, officials. So again, I don't think that Congress's omission was designed in any way to dispense with that requirement. And the reason why this is significant is that it goes both to our argument concerning the constructive amendment and to our argument concerning the instructions. And if I can say just a word about the instructions, and I want to make sure to cover our argument on this, because that is our argument for outright reversal. On the instructions here, the district court refused to give the quid pro quo instruction that both we and the government requested, and that the model instructions from this circuit seemed to contemplate. And with regard to the federal funds bribery count, the Section 666 count, and the Travel Act count, the district court simply dispensed with any requirement of an official act altogether. So a fortiori, the district court didn't give any instruction requiring a quid pro quo. Why, what does the record show as to why the district court declined to give the model instruction on quid pro quo, or the in exchange for language? So the record doesn't really indicate the district court's thinking on that. I think with regard to Section 666, the district court seemed to take the more expansive and uber-textualist view that official acts weren't required under any of these statutes at all. And I think that that's why the district court- When you say any statutes, I'm sorry to interrupt, but either 666 or the honest services? Yes, that's correct. And as I said to Judge Colleton, the whole point of the Supreme Court's decision in skilling, of course, was to eliminate a concern about vagueness, and a particular concern about chilling otherwise permissible activity between citizens and their also the reason why the failure to give the quid pro quo instruction was so troubling here. It allowed the jury to convict, and indeed, it allowed the government to argue for a conviction based on a mere intent to influence a public official on this sort of generalized theory that Mr. Sewell could be convicted if he viewed the public official at issue as an insurance policy. And the concern about that is precisely the concern that the Supreme Court and Justice Scalia noted in the opinion in Sundiamond, namely the concern about taking garden variety activity, a group of farmers in Justice Scalia's example who take out to lunch the Secretary of Agriculture, knowing that there are various things that the farmers would like the Secretary of Agriculture to do, without a quid pro quo requirement, a jury can return a conviction for that sort of conduct. And of course, our whole defense in this case was that first, Mr. Sewell intended to give this money to the church for charitable purposes. He did not intend for this money to go to Mr. Jones, the state official in question. And that second, to the extent that Mr. Sewell had an intent to any citizen who has matters before a public official, for that public official to take favorable actions. Sundiamond does have language defining that an intent to influence as part of sort of that paragraph trying to define what in exchange for means. Your position is that that's not accurate or that the law has somehow changed since then? No, I think that Judge Kelly, I think there's a little bit of ambiguity in Justice Scalia's opinion in Sundiamond about where the quid pro quo requirement is located. I think that requirement really has to be located in the separate requirement that the defendant act corruptly with a corrupt intent and not in the separate requirement that you have an intent to influence. And I think, again, the Fourth Circuit's decision in Jennings, I think, lays this out as clearly as anything that I've seen. I think there has been some understandable confusion and this is reflected to some extent in some of this court's other model jury instructions that seems to equate those two requirements. But it's quite clear from the text of section 201 in particular that these are separate state of mind requirements and that the criminal intent is really the requirement of a corrupt intent. Again, because the intent to influence an official action in and of itself is not criminal. That is an intent that many ordinary citizens have. So, again, I think that that's probably where the district court went wrong here and I think it really matters in this case given the government's theory and given the state of the evidence. I think this is a quite different case if the government bore the burden of having to show that Mr. Sewell, in fact, given the obvious deficiencies in the government's case. Let me be sure I understand what you're saying because in Sundiaman, Justice Scalia has a sentence that says bribery requires the intent to influence an official act. And then he puts the in other words and uses your quid pro quo language. Doesn't the in other words mean they're the same thing? I think that the in other words was a little bit imprecise and I hesitate to be really again for the reasons that the fourth circuit says to say that that flows from the intent to influence requirement. I think it really does flow from the term corruptly, which is what conveys the requirement of that exchange. In other words, judgment and I think you have to prove both of those things. And I think that the government recognizes much when it submitted its model, its proposed instructions that contain such a requirement. Now, I want to say one last thing on this and I do want to circle back to the constructive amendment argument. I think that government attempts to kind of resuscitate the judge's instructions by pointing to the fact that on I believe page 21 of the addendum, there is a concluding sentence at the end of the instruction on official acts to the effect that the jury may consider all of the evidence in determining whether or not there was an exchange. But that instruction, that sentence did not in any way purport to lay out the elements of the offense. That was simply a procedural instruction. That was an instruction that merely told the jury that it should consider all of the evidence. And I think even if you had a jury of 12 sophisticated lawyers, never mind a jury of 12 lay people, they would not have realized from that sentence alone that an exchange is in fact an element. If you look a couple of pages earlier at the instruction on the scheme to defraud, which is really the relevant element, that is where both sides proposed the quid pro quo instruction and those instructions conspicuously do not require that element. Now all of this is I think also relevant to the argument concerning the constructive amendment and I do want to say a little bit about that because I think that there is you know perhaps some confusion as a result of the way the government has presented this. The government attempts to suggest that to the extent that we're relying on these repeated allegations involving an agreement to look into various issues, that those were somehow not essential allegations in the indictment. In fact, those are really the critical allegations. If you look at the section of the indictment entitled official acts and if you look at each of the five categories of official acts that are in play here, that allegation is contained in the ultimate paragraph of nearly all, there's one exception, of the various issues. And the government attempts to say that well the reason that that allegation was in there was simply because we had a conspiracy count and that allegation was somehow limited to the conspiracy count. But I simply don't think that that's a fair construction of the indictment. To be sure, all of the factual allegations in the speaking indictment were contained under count one, under the conspiracy heading. But they were all incorporated in the later accounts as well. And there's a reason I would submit why the government charged the case in this fashion. It was because this was a case where there was no dispute that Jones in fact did not take any official acts. And so the government, I think in an understandable effort to overcome the implausibility of a theory under which Mr. Sewell would repeatedly pay money in return for nothing, attempted in the indictment to suggest that Mr. Sewell made payments in return for this agreement merely to look into the issues. But if the allegation were that Mr. Sewell asked him to look into it, your argument may carry more weight. But here he's asking for something else, right? Isn't that a fair reading of the indictment? I think that there's no doubt that there are allegations to that effect prior to the allegations concerning the agreement, but the allegations concerning the agreement, Judge Kelly, really do narrow the government's factual theory. They narrow it to a theory in which this agreement is somehow central. And if you look at the evidence at trial, you will see that the defense went to great lengths to defeat the allegations concerning the existence of an agreement. And it only really became clear through the course of the presentation of the government's case that the government was attempting to move away from that. Of course, it's important to remember the timing of all of this. McDonnell did come out prior to the trial. There was a motion to dismiss, and indeed this issue had been raised even before McDonnell, but the defense, of course, relied on McDonnell after it came down. And the government had an ample opportunity to fix this The government could simply have gone back and attempted to obtain a superseding indictment. And how would that indictment charge have looked, in your mind, based on what the evidence was that came out at trial? Well, I think that the government would have had to obviously omit all of these allegations concerning an agreement and attempt to reframe its claims in terms of an intent and the requisite intent. It's not entirely clear to me what the government could have done with the conspiracy count. The conspiracy, of course, requires an agreement, a different kind of an agreement, an agreement to violate all of the various public corruption laws. But instead, the government chose to roll the dice. What about the honest services? Tell me what that would look like, in your mind, had they gone back and amended? So we're not disputing that the indictment, at various points, sets out the statutory elements of the various offenses. But at a minimum, those counts would have needed not to rely on this factual theory concerning an agreement. That's really the flaw that we're identifying here. And I think it's established law that where the facts alleged in the indictment go to the essential elements of the offense and where the government alters the facts pertinent to those essential elements at trial, that's a constructive amendment. This court has said so as recently as a few days ago in the McDill case. I think that's an established formulation for a constructive indictment. And of course, where you have a constructive amendment and where you have a constructive amendment, that gives rise to structural error. Now, I do think that this argument does go- That's an open question in the circuit, I think, whether it's a structural error, isn't it? No. Well, I don't think that the question of whether a constructive amendment constitutes structural error is an open question. Of course, there's a great deal of ambiguity about where exactly the line falls between a constructive amendment and a variance. You know, those are really just labels. We'll check that. We'll check whether it's an open question. But there is a question in the briefs about whether this is a very alleged variance or an alleged constructive amendment. You say there's ambiguity as to the line between those. But what is the specific change in the elements of the offense that you allege? So this is the factual theory that goes to how the government proposed to establish intent and to establish a scheme to defraud. But isn't a change in the facts usually considered a variance, whereas a constructive amendment is a change in the elements of the charge? I think that it is altering. Let me use the court's formulation and then explain why it's satisfied here. This court has said, I think this dates back to the Begnaud decision, that an element is constructively amended where inter alia the essential elements of the offense set forth in the indictment are altered. And I think that this court's cases, like the cases of other circuits, make clear that it's not just about how the government in the indictment states the elements. I think it's an established principle that where the facts relevant to the elements are changed sufficiently, significantly at trial, that that's a constructive amendment. And Judge labels that courts apply to distinguish between those sorts of minor errors that require a showing of prejudice and those sorts of significant errors that require an outright reversal. In other words, that are structural. Now I do want to say how all this relates, because I know that there are a lot of issues floating around in this case. I do think, as I indicated earlier, that the constructive amendment issue goes hand in glove with the instructional error. Because it's not simply that the government pursued a different theory at trial on which we had no notice, namely a theory that did not require the existence of an agreement. It's that the government was able to argue simply that if Mr. Sewell gave money, something of value, with an intent to influence a public official, without the additional requirement of a quid pro quo, that would be sufficient for a conviction. And that's where the district court's instructional error comes in. So I say that just to sort of underscore that there's a relationship between the constructive amendment argument and the instructional error. And at a minimum, if you agree that the district court's inexplicable dispensing with that vital requirement in the instructions was erroneous, then a new trial is therefore required here. And I really don't think that the government can argue, given the failure to give a quid pro quo instruction was somehow harmless on this record. Now, I'm a few minutes behind you. You said you like the Jennings case, right? From the Fourth Circuit? Yes, that's correct. Well, now, it has a sentence that says, the quid pro quo requirement is satisfied so long as the evidence shows a course conduct of favors and gifts flowing to a public official in exchange for a pattern of official activities favorable to the donor. Isn't that enough here? Well, you've got to have the in exchange for in the instruction. And, you know, to be sure, there's no magic words requirement. There's no requirement that the instruction somehow use the words quid pro quo. But that concept of a specific intent to give something of value in exchange for the official act is critically important. There has to be some nexus there. And, again, the district court's instructions completely dispense with that. I do want to say just a little bit about the evidentiary errors in this case because I do think that they are quite significant and, again, provide a basis at least for evocateur in a new trial. You know, first of all, I would focus on the exclusion of evidence that really went to the motive of what turned out to be the government's really sole materially helpful witness, Philip Carter, in testifying against appellant. What the district court did here was really twofold. And notwithstanding the government's effort to sow confusion on this score, I think there can be no doubt that the district court excluded evidence in two respects. First, it excluded evidence that the government, in fact, agreed not to prosecute Carter for committing election fraud on 14 other occasions. And, second, that Carter was given a sentence reduction for his cooperation on the only count of election fraud to which he pleaded guilty. As a result of those exclusions, which not only occurred in limine, but also occurred during the testimony of the government's first witness, Philip Spainhower, the defense was only able to point to the bare fact that Carter had, in fact, pleaded guilty to one count of election fraud. And this court's case is made clear, and I would rely primarily on this court's decision in the Wally case, that evidence of additional criminal conduct covered by a non-prosecution agreement is relevant to show bias, because, in the court's own words, quote, the witness's motivation likely depends on the magnitude of the benefit that he expects to receive for cooperating. Well, you say the only thing they were able to show is that he pleaded guilty to one count? Yes. Were they able to show that he was seeking a sentence reduction, that he hoped to be released immediately after the trial? Yes. And I think you're referring to the exchange that took place around about page 412 of the transcript. And that related to his conviction for the conduct in this case. So, in other words, it's important to keep in mind he pleaded guilty to the one count of election fraud, and he also pleaded guilty to one count of public corruption in connection with this case. And we were able to elicit testimony that he was hoping for a sentence reduction in that case as a result of his cooperation here, but we were not able to expose the size of the benefit that he received, the magnitude of that benefit, from the earlier election fraud deal. And, of course, that was the deal that took place in the immediate aftermath of his actual cooperation with the government's investigation. And so, again, we submit that that was plainly the central witness in the case, that that was plainly prejudicial. And, indeed, as we note in our brief, the district court acknowledged that the government was, in his own words, taking a chance in pressing this issue, and that he might be wrong on the issue. Well, what did you want to ask him? Whether the government agreed to forego certain other charges? Sorry? You wanted to ask Carter whether the government had agreed to forego certain other Well, we actually wanted to present, to be specific, during Spain hour's testimony, we wanted to present evidence that the government believed that Carter had, in fact, committed election fraud on these 14 other occasions. Well, but that's 608B situation, isn't it? I mean, you're trying to introduce extrinsic evidence through an agent about what Carter did. I thought it's one thing to say you wanted to ask Carter, isn't it true that you weren't charged with bribery? Well, we certainly, I mean, just to be clear, we wanted to do that as well. But you did ask him that, right? You asked him you weren't charged with wire fraud, you weren't charged with travel act, he admitted those things. But in connection with this particular conviction, not in connection with the earlier election fraud investigation, and I would note, Judge Colleton, that the government- Was that part of the plea agreement in this case? Or part of any agreement in this case? Well- That he wasn't charged in an earlier- There was the earlier plea agreement in the election fraud case, which I think did- in which the government decided not to prosecute. And there was a similar provision in this case- Were you precluded from cross-examining him about the earlier- Yes, we believe that we were as a result of Judge Wilson's earlier ruling. And I would just note that the government really took advantage of this when it proceeded in closing to paint Carter as a hard worker who had been taken advantage of by Sewell. So the government really exploited this exclusion. What about Rule 608B? Why wouldn't that apply here? Because these were election fraud convictions, and so it goes to character for truthfulness, Judge Colleton. And so even if you thought that Rule 608 would otherwise be triggered, a conviction for fraud, I think, is a paradigmatic example of a conviction that falls within that category. I see my time is very short. I haven't looked at the transcript. I'll be very quick. How many times, to your knowledge, did they say crimes when they talked to Carter? You agreed not to prosecute for crimes in the plural that the government knew about in the transcript. The jury heard that the government agreed not to prosecute Carter for crimes, plural. You know, the plural word as opposed to the singular word. Yeah. I mean, I haven't searched the transcript. Was it often or not at all? Well, to the extent that that happened, it would have been in connection with this case. In other words, not in connection with the earlier election fraud. I want to say just a word about the other exclusion, the exclusion of the evidence concerning Mr. Sewell's charitable giving to other Christian causes. In our view, that simply goes to the element of intent. And Mr. Sewell, if he had been able to present the evidence of the extensive contributions of his own and of his family, would have been able to establish that his intent here was an intent to benefit the West Memphis Church as a Christian cause. That was critically important because the jury may well have wondered why Mr. Sewell, a white man, was making contributions to a predominantly African American church in a place where he did not live. Didn't you get any proof that he gave to 70 different charities and churches and all this kind of stuff? They were not able to quantify the fact that he gave $1.4 million to a variety of different Christian causes. That was the defense. That was the defense's Exhibit 1. And so while they were able to present generic evidence of his giving, they weren't able to present evidence of the pattern of giving. What about his general reputation for giving to Christian causes? There's a lot of testimony on that apparently. There's reference, there are certainly references to the fact that he was a Christian man who supported Christian causes. But again, if Mr. Sewell had been able to quantify this and point specifically to evidence that he gave money to other Christian churches, that might have answered the jury's very first substantive question, which was whether or not Mr. Sewell had in fact given money to other churches. And again, the government exploited this when it said that Mr. Sewell's generosity, quote, depended on what would come back to Sewell's companies and Sewell's ultimate pocket. This evidence in Exhibit 1 would have belied that, but it was nevertheless excluded and therefore prejudicial. And I would like to reserve whatever remains of my time for rebuttal. Very well, you may. We'll hear now from counsel for the government. Mr. Keller. Thank you, Judge Carlton. Yes, John Keller on behalf of the government. May it please the court. I want to start with the jury instructions here, because as counsel noted, the defendant is not entitled to a particularly worded instruction. That's clear black letter law in the Eighth Amendment, and there is nothing sacrosanct about the word exchange in bribery instructions. So the omission of the phrase in exchange for is not a problem with these instructions, where the concept of a corrupt intent was adequately stated in the jury instructions by the language of intending to influence Jones or intending to induce an official act. Putting that aside for a moment, as counsel also noted, it's actually at page 20 of the jury instructions in the official act instruction, which the court specifically incorporated into counts two, three, and four, the honest services fraud counts. The court required that the jury find an exchange of money for official acts in order to convict Sewell. Now, the appellant argues that that was a permissive statement because the court started that sentence with you may consider all of the evidence in this case in order to determine whether Sewell intended an exchange of money for official acts. But the permissive nature of the beginning of that sentence was limited to the universe of evidence that the jury could could consider, because, of course, as always, the jury can consider some evidence or reject other evidence. I don't think he's saying it's permissive. He's saying it's a procedural instruction that tells the jury about what it may consider, but it isn't the sort of instruction that would cause the jury to think that it's defining an element of the crime. I think that was the argument this morning. You're right, Judge Colleton. That was that was the argument this morning. That is not the argument in the briefs. Well, what do you say to the argument this morning? The argument this morning that this was a procedural instruction, I think, is belied by the fact that the beginning of that instruction says counts two, three, and four require you to find an official act, and then goes through and defines official act in accordance with the language of McDonald and ends that requirement that the jury find an official act with the statement that the jury is required to find an exchange of money for official acts. Why wouldn't you put something like that in the verdict director? What I call the verdict director. That's page 17, right? Closing instruction 14. Why wouldn't you put something like that in the director itself? Tell me if I don't get what your argument is. Judge Ben, as to the specific location where that sentence should have been inserted or where it could have been inserted in other locations, this court could disagree with the way that the judge formulated the structure of the instructions, but the content is there, and the court is required to consider the instructions as a whole. And so the fact that it was here in this instruction, the official act instruction, I think sufficiently required the jury to find this exchange that appellant is so concerned with. Further, of course, the judge is entitled... The term official act, is it in the... I'm sorry, I'm trying to skim it now. Is it in the verdict director, the term official act at all? I'm sorry, I don't know exactly what you refer to as the verdict director, Judge Ben. I can't word search it, but I don't think so. I think he's referring to the instruction that lists the elements. The one that lists the elements. Of honest services fraud, Your Honor? 14 is the one I'm looking at. Tell me if I'm looking at the wrong one. 14 is... I think that's the bribery. That's the bribery, yeah, for sure. So you're not referring to bribery, you're referring to honest services. Yes, the instructions on honest services fraud, which I believe at pages 17, 18, and 19 of the jury instructions did require that the jury find an official act. The language of official act is included in those instructions. The only substantive elements from which official act was omitted was in the jury instruction on 666, which is at page 21. That's 14. Of the 666. And you say why it was omitted there, because... Yeah, why is it omitted there? It was omitted from the one count, the 666 count, because the court decided that the language of 666 does not require an official act and that McDonald's holding with regard to honest services fraud does not need to constitutionally be extended to 666 because of the language of that statute. And that's precisely what the Second Circuit just held in Boyland, as we note in our 28J letter. But then why are you trying to say it's in 15? See why I'm confused? Are you trying to say official act is in 15 and that's enough? I was pointing out that the language of exchange was incorporated into the honest services fraud counts at page 20 of the instructions through the official act instruction. And you're saying the official act instruction was applicable to the honest services counts, but not to the 666? That's absolutely correct. And the reason why it does not need to be included in the 666 instruction is because unlike the very general language of honest services fraud, 1346 says something like, for the purposes of these statutes, money and property includes the intangible right to honest services. That's the language that the court was dealing with in McDonald. Here, section 666 is much more specific. The language requires that there be something corruptly given with the intent to influence a business transaction or series of transactions in the realm of the public official's responsibilities who is accepting the bribe. And so the language of 666 narrows the universe of quote unquote official action that the statute could address in the first place without needing the court to import the requirement of official act into that statute. It's already narrowed by the language of business transaction or series of transactions. And as appellant points out, Jennings has further narrowed 666 by requiring that the court include a description of what that business transaction or in the jury instructions, the court specifically described the business transaction or series of transactions as the Department of Human Services' oversight of the defendant's businesses and its reimbursement of Medicaid billing for the defendant's businesses. And so with that level of specificity in the jury instructions, the court's concerns about vagueness in McDonald under the historical interpretation of official act is just not present. With respect to that point also addresses another point raised here this morning on corrupt intent. Again, counsel cites Jennings for the premise that this exchange for language is necessary because simply informing the jury that they had to find an intent to influence a business transaction or series of transactions does not fully capture the corrupt intent requirement. But what Jennings said is that it had nothing to do with the language of intent to influence or in exchange for. In fact, Jennings used the language in intent to influence in the opinion in describing the quid pro quo and corrupt intent. What Jennings said is you have to specifically define what the individual intends to influence. And the problem in Jennings was that was no description of what the defendant in that case intended to influence. Here, as I just noted, the instructions do point the jury to what the defendant intended to influence. And that was Medicaid reimbursements flowing from the Department of Human Services to his businesses and the Department of Human Services' oversight of his businesses. And so the concerns raised in Jennings about ensuring that corrupt intent was sufficiently stated in the jury instructions was adequately addressed by the jury instructions here. Do you want to address the claim of constructive amendment or variance? Yes, your honor. On the constructive amendment, appellant argues that the indictment should be read as alleging purely an agreement, a corrupt agreement, between appellant and Steve Jones, the public official. But what the Eighth Circuit requires is a fair reading of the indictment. And that's indictment is sufficient under any reasonable construction, then it should be upheld. And here, the only reasonable construction, when you look at the actual allegations in the indictment, is that the indictment alleged that appellant intended to influence Jones in the performance of official acts. The language of agreement was included in the conspiracy allegations in the very first pages of the indictment, at pages three and four, that appellant and Jones agreed to exchange, or that Jones agreed to exchange official acts for payments. But the actual substantive descriptions of the official acts that were requested come at page 21 of the indictment, in paragraphs 149, 150, 151, 152, and 153. And as Judge Kelly pointed out, in each of those paragraphs, the government alleged that Sewell asked Jones to engage in various official acts. Acts that the defendant does not, or that appellant does not dispute now and has never disputed, would constitute official acts under McDonnell. So the idea that the indictment only alleged an agreement, and that the evidence at trial proved intent to influence, is belied by the very allegations, the language of the indictment. I would also say that the evidence at trial was not inconsistent with an agreement. The government put on evidence that these individuals talked on the phone in recorded conversations. The government admitted the recorded conversations in which these individuals discussed their understanding, discussed the official acts that appellant was requesting, and discussed the payments that Jones would be receiving, and discussed their meetings to address these issues. The evidence included a video of these three individuals, appellant, the middleman, and Jones, sitting down at a restaurant together to discuss appellant's request for official acts. And on that video, appellant is seen to slide a bribe check to the middleman, Philip Carter. The jury may have rejected the agreement in terms of the conspiracy, and acquitted on the conspiracy count because of Jones's inconsistent testimony at trial. But there was evidence of an agreement, of an understanding put forth at trial. There was no surprise. There was no change in strategy, or in theory, by the government at trial. And so the idea that certainly there was no constructive amendment because no essential element of the offense was modified or changed at trial. An agreement is not an essential element of any of the offenses of conviction, honest services fraud, 666, or travel act. That is a simple fact. An agreement is not an essential element of any of those crimes. And so there is no constructive amendment here. I'm really talking about whether there was even a variance. And there was not a variance because the facts that were alleged in the indictment were facts that the government presented at trial. Including Jones's response to appellant's request that he'd look into the matter, that he'd look into it. That, in the indictment and in the testimony at trial, was clearly Jones's colloquial way of expressing his agreement to look into these, or to take official acts. And so the fact that that agreement may have been superficial, and that Jones actually had no subjective intent to carry out this agreement, is immaterial for the purpose of defendant's guilt. Because defendant's guilt rests solely upon his intent. And his intent was sufficiently alleged by the allegations in the indictment and by the evidence at trial. As to the evidentiary issues that counsel noted, first, as to cooperating witness Philip Carter, who was the middleman that appellant used to relay his request for official acts to Jones. Carter was cross-examined as to, on day three, volume three of the trial transcript, at pages 344 through 347. Carter was cross-examined as to his desire to please the government, as to the fact that he told the FBI he would help them get as many big fish as possible. All he wanted to know is how the FBI wanted them, fried, blackened, or grilled. As to the fact that he used an expletive F, Ted Sewell. As to the fact that he expected and hoped, maybe not expected, but hoped that in exchange for his testimony, he would be able to walk out of the courtroom a free man after testifying in this case. What exactly were you seeking to exclude in your motion in Lemonade? The only thing that the motion in Lemonade, which I believe is docket number 71, sought to exclude was the underlying facts of Carter's prior vote-buying conviction. Facts such as the fact that he gave people and offered chicken dinners and cheap vodka and whiskey to absentee voters in order to get them to give him their absentee ballots or fill out their ballots in a certain way. Those facts underlying the conviction, which are clearly precluded under 609 and 608, were the facts that the government sought to preclude in its motion in Lemonade. The government's motion in Lemonade never references charging concessions. Because that was part of the deal for him, for Carter? Both of those convictions were part of the deal? Carter had two separate plea agreements. He pled to vote-buying early on, but at the time he pled to vote-buying, the government was already investigating this case. And so Carter's cooperation in this case was a consideration in the plea agreement for that earlier vote-buying case. So was there anything that the district court ordered that precluded the defense from eliciting from Carter that he received charging concessions in the vote-buying case? Absolutely not. So they could have asked him about how he committed X number of other voting fraud violations and wasn't charged with them? Yes. They could have, on cross-examination, asked Carter whether he understood that he could have been charged with 12 counts of vote-buying and was only charged with one. They could have asked Carter about the fact that he received a 50 percent reduction in his sentence in that earlier plea, in that earlier case, the vote-buying case. There is no ruling in the record, no ruling in the record that precluded them from asking those questions. The only ruling that gets close is the one that counsel referenced this morning, and it is referenced in their brief, where they sought to elicit the charging concession from the FBI agent during trial. And the judge ruled to sustain the government's objection at sidebar because the government was unclear exactly where that testimony was going and objected to any sustained the objection, did not allow them to ask the case agent about those charging concessions, about the fact that Carter could have been charged with 12 or 13 counts. I thought it was 14 or 15. Or 14 counts of vote-buying in addition to the first count. Normally you would ask Carter that. That's exactly right. But I think what he's saying is they wanted to get this evidence of the facts in, in addition to the concessions, to show character for truthfulness or untruthfulness. That's what I heard this morning. Judge Caldwell, I think there are two separate arguments that they're making. One, that the facts should have come in to show his character for truthfulness under 608B. And second, that the charging concessions should have come in to show his bias and favor. And I hear you saying there was nothing that prevented the charging concessions from coming in on cross-examination of Carter. That's, that is accurate, your honor. Whether they asked him or not, we don't, we'll have to check. They did not ask him. But what about the first point? Whether they should have been allowed to get into the facts? The, the facts are a, under 608B, are a discretionary decision by the trial judge. Here the judge decided that the, the facts underlying the convictions, such as the fact that he was offering people chicken dinners and, and cheap liquor for their votes, was, was not relevant or was more prejudicial than probative in, in this case. And, and that's, that is clearly a discretionary call by the judge. So it was a Rule 403 type ruling? 608 and, and 403, yes. Yes, Judge Carlson. It certainly would not constitute an abuse of discretion here to avoid confusing the jury about this kind of unrelated criminal conduct that Carter engaged in that had, that had no bearing on the criminal conduct at issue here. How about the charitable contributions? Why wasn't that relevant to intent? So the first response, and again, I know the court has addressed this to some extent this morning, but is that appellant got in significant evidence of his charitable donations. He got in evidence that he donated to, made over 70 donations to the exact church at issue here, the church, the 15th Street Church of God in Christ, that he made over 70 donations to that scheme in this case. Those are certainly the most relevant as to what his intent was in this case. Not what he and his family may have given to other charitable organizations, including churches, starting in 2002, nearly a decade before the crimes charged in this case. Didn't the jury though, asked a question, didn't they, about has this man ever given any kind of contributions to other churches? So to say it's not relevant, at least to the jury, it seemed that it was. Well, the jury may certainly, the note indicates that at least one juror was interested in this issue. I think jurors are often interested in issues which may not be relevant and may not be admissible at trial. Here though, the evidence actually showed that the defendant had made donations to other churches. So on day four, volume four of the trial transcript, at page 654, a witness named Tina Smith testified for the defense. And this was a young woman who had been counseled, had received mental health counseling at one of Appellant's businesses, the Lord's Ranch. She came in and testified as to her positive view of reputation, and she testified specifically that the defendant gave to other churches. Those were the words that came out of her mouth. Then Appellant testified in his own defense on day five, at page 715 of volume five of the transcript, that he and his family gave to many ministries, both in the country and outside the country. And he referenced a specific ministry in L.A. that he remembered when he was a young child running around in that his father supported financially. His mother also testified that same day and testified that there were a number of charitable organizations that they regularly donated to. And so that evidence was in the record. Appellant was not denied the opportunity to present that evidence. Now what Appellant wanted to introduce, which is on the first page, I believe, of his motion for new trial, was a chart outlining 250 charitable donations made by him and his family members between 2002 and 2014, totaling approximately $1.4 million. That evidence was irrelevant, cumulative, and it was certainly not an abuse of discretion for the court to preclude that evidence. As to the official act issue, which I touched on briefly in discussing the jury instructions, Appellant's argument is that the indictment here, again, alleged a mere agreement to have Jones consider engaging in official acts. But again, that is a mischaracterization of the indictment's allegations. The indictment clearly alleged that Appellant sought true action by Jones, and that's perhaps best displayed at pages 22 and 23 of the indictment, where a phone call between Appellant and his middleman, Philip Carter, a transcript of that call is included in the indictment. That call was recorded when neither Appellant nor Carter knew that they were being recorded. And in that call, Appellant says to his middleman, Philip Carter, the DHS, which was the agency where Jones was the number two, the DHS in northeast Arkansas, they give all their referrals to MidSouth, this competitor company, in outpatient, and that needs to have a stop put to it. He says, Jones could put the stop to this because that's under his purview. All he'd have to do is send out a memo or start telling his department heads, don't do it anymore. And he says, in the beginning of the conversation, he asked Carter, I wish you would ask him because he could put the stop to this without making it about us. There is no clearer allegation or evidence of Appellant's intent than those conversations about the official acts that he was requesting when he didn't know he was being recorded. And those conversations show clearly, both in the allegations in the indictment and in the evidence that was presented at trial, that Appellant intended to influence Jones in official acts, that he was paying Jones for action. This semantic ploy by the Appellant that the indictment only alleged an agreement for Jones to consider official action is simply belied by the actual allegations in the indictment. If there are no further questions. I do have a follow up. Sort of going back a little bit to the assertion by Mr. Sewell that there's a lack of in exchange for language or quid pro quo for the honest services. Where do you think, if you were the jury and looking at the instruction, where's the key point where they would have to find the in exchange for, if we use that phrase? To answer your question, the in exchange for is listed at page 20 of the instructions in official act instruction at the bottom of the instructions. So you think, is that in your position? That's where it is? Well, that is the place where exchange appears. But it's my position, it's the government's position that the corrupt intent was sufficiently alleged in the honest services fraud instructions where they say Appellant paid Jones to induce the performance of an official act. So in your view, that phraseology is the equivalent of in exchange for? That's exactly right. As long as official act was sufficiently defined, which it was here, Appellant does not dispute that. As long as official, again, the whole question of whether in exchange for is synonymous with intent to influence really comes down to what comes after those words. In exchange for what? With intent to influence what? And here, the what is an official act. An official act was properly defined in the jury instructions in accordance with McDonald. Now on the 666 instruction, official act is not included. But what was included instead, as I mentioned earlier, is the language of the statute, which is business transaction or series of transactions, and then the critical description of DHS's oversight of Appellant's businesses and its reimbursement of Medicaid billings by Appellant's businesses. Well, I guess back to the honest services count, in the elements 1, 2, 3, 4, is it your position that in the first element, saying that he made payments with the intent that Mr. Jones would take official actions, that that's essentially in exchange for, that's the language that's sufficient? Absolutely. Absolutely. And that is- Because it's not an official act. It's official actions. Is that- Yes. Because we have to define, right, the official act. Yes, Judge Kelly. So it is my position, it is the government's position that the jury instructions were only required to require the jury to find that Appellant paid Jones with intent to influence an official act, official action, or in the 666 context, business transaction or series of transactions. The jury instruction does not need to list the indictment or the factual allegations that were presented at trial. The jury instructions simply need to define official action or official act in a way that is consistent with McDonnell and that avoids the constitutional concerns that McDonnell addressed. And so because we do have a sufficient definition of official act here, that's all that was required. The elements were that Appellant paid Jones with the intent to influence an official act or with the intent to induce official action. And official action was defined in the language of McDonnell as something specific pending before the public official at the time that required a decision or action and that the public official actually took action on that pending matter that was before him. That was all set out in the in the 1346 instruction. And in fact, the pattern instructions don't require any detailed factual recitation of what the official act is and no authority. None of the cases that have been cited in this case require that the official or that the honest services fraud instruction go into the factual details of what the official acts were that were requested. It simply needs to set out that Appellant sought to induce official action in return for money. Very well. Thank you for your argument, Mr. Keller. Thank you. We'll hear now Mr. Chamigan in rebuttal. Thank you, Judge Cotton. I have three points on rebuttal, so I'll talk relatively fast. First, with regard to the instructional issue. The problem here is with the instruction that Judge Benton referred to as the verdict director. Instruction number 14. Excuse me just a second. We probably should start the clock. Sorry. Go ahead. The instruction number 14, the instruction on honest services fraud, was fatally flawed. And the best evidence of this is the government's proposed instruction on that issue. This is docket number 91 at page 19, where the government says that the phrase scheme to defraud means any plan of action intended to deceive another out of the right to honest services, quote, where a bribe is paid in exchange for official action or an official act. And then it proceeds repeatedly to refer to an exchange in the ensuing sentences. And yet the instruction given by Judge Wilson at page A19 says that the phrase scheme to defraud means a plan intended to deceive another out of the right to honest services, quote, where a bribe is paid with the intent that Mr. Jones take official action or an official act. That is the point at which an exchange should have been required, and yet the judge omitted that. The sole remaining question is whether you can somehow cleave off that flaw with the instruction on honest services fraud from the federal funds bribery count, section 666. And on that issue, I would just make two quick points. First, the government does not acknowledge this court's decision in Zimmerman, which at 509 F3rd 927 says, quote, section 666 prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action. Are you sure that official action just doesn't mean anything under the statute? It doesn't really mean an official act. It's kind of a shorthand? Well, I would refer to the Fourth Circuit's decision in Jennings again, and there's been a lot of back and forth on that. But I would really urge the court to look at Jennings, because Jennings locates this notion, you know, not just in the term official act. What we're talking about is the requisite exchange. And section 666 does, Judge Colleton, to get back to the text of the statute, it does require a corrupt intent, just like section 201 does. And to the extent that section 666 was designed to reach bribery in the context of a public official, what that has to mean is that you give something of value in return for an official act of some sort, namely an act by the official. And so we believe that the district court should have given the same instruction with regard to section 666 as well, and that that instruction therefore cannot stand. Second, on the evidentiary issues, I would simply submit that Mr. Keller is incorrect about what the district court actually did. And I would urge this court to look at the exchange beginning at page 184 of the transcript and running to page 197. And this was in the context of Agent Spienhower, but the district court's ruling ultimately obviously reached subsequent cross-examination of Carter as well. Well, hold on. I know you want to make one more point, and I'll let you do that. But did you try to cross-examine Carter about charges that were foregone in the first plea agreement? I think the district court's ruling by page 197 plainly made clear that the district court thought that its earlier in limine ruling reached this as well. Mr. Carey unambiguously sought to present evidence that Mr. Carter was involved in election fraud 14 to 15 times, page 184. On page 185, he tried to bring in the fact that Mr. Carter got his sentence reduced for cooperation. Okay. We cannot get that. Strangely, the government denied that that had actually happened, but then the district court at page 188 wonders whether that evidence is relevant and then proceeds two sentences later to sustain the objection. And if I could very quickly make my third point. This was a very unusual case for the simple reason that Jones conceitedly took no official acts and indeed did not receive most of the payments that Mr. Sewell made to the West Memphis Church. And Judge Wilson really did make a series of idiosyncratic rulings both on the instructions and on the evidence that in our view prevented Mr. Sewell from fully presenting his defense. So at a minimum, we think that this judgment ought to be vacated and the case remanded for a new trial. And of course, we think that ultimately because of the constructive amendment, the judgment should be reversed. Thank you. Very well. Thank you to both counsel for your arguments. The case is submitted. The court will deliberate and file an opinion in due course. Thank you very much.